UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DV DIAMOND CLUB
OF FLINT, LLC, *et al.*,

      Plaintiffs,                           Case No. 20-cv-10899
                                               Hon. Matthew F. Leitman

v.

UNITED STATES SMALL BUSINESS
ADMINISTRATION, *et al.*,

      Defendants.

_____/

## OPINION AND ORDER GRANTING PLAINTIFFS' AND INTERVENORS' MOTIONS FOR A PRELIMINARY INJUNCTION (ECF Nos. 12, 23)

In order to mitigate the economic devastation caused by the COVID-19 pandemic, the United States Congress passed, and President Trump signed, the Coronavirus Aid, Relief, and Economic Security Act (the "CARES Act"), Pub. L. No. 116-136, 134 Stat. 281 (2020). A primary purpose of the CARES Act is ensuring continued employment and income for employees of American small businesses. To that end, Congress created the Paycheck Protection Program (the "PPP") as part of the CARES Act. That program authorizes the Small Business Administration (the "SBA") to guarantee hundreds of billions of dollars in loans to small businesses. The loans are to be made by private lenders, and they may be

forgiven if, among other things, the businesses use the funds to continue to pay their employees' wages. *See* 15 U.S.C. § 636(a)(36); 15 U.S.C. §§ 9005, 9006.

Congress intended that the SBA would make the PPP loan guarantees widely available to small businesses across the commercial spectrum.  Indeed, Congress was aware that the SBA had historically declared certain classes of businesses ineligible for SBA lending, and Congress set about to "[i]ncrease[] [e]ligibility" for PPP loan guarantees. 15 U.S.C. § 636(a)(36)(D).  Congress did that by establishing only two criteria for PPP loan guarantee eligibility and providing that "*any* business concern … *shall* be eligible" for a PPP loan guarantee if it met those criteria. 15 U.S.C. § 636(a)(36)(D)(i) (emphasis added).

Despite this direction from Congress, the SBA adopted a rule excluding from PPP loan guarantee eligibility a wide range of businesses – including banks, political lobbying firms, certain private clubs with restrictive admissions practices, and sexually oriented businesses that present entertainment or sell products of a "prurient" (but not unlawful) nature (the "PPP Ineligibility Rule").  While Congress may once have been willing to permit the SBA to exclude these businesses from its (the SBA's) lending programs, that willingness evaporated when the COVID-19 pandemic destroyed the economy and threw tens of millions of Americans out of work.  Simply put, Congress did not pick winners and losers in the PPP.  Instead, through the PPP, Congress provided temporary paycheck support to *all* Americans

employed by *all* small businesses that satisfied the two eligibility requirements – even businesses that may have been disfavored during normal times.  Thus, the SBA's PPP Ineligibility Rule is invalid because it contravenes the PPP.

The Plaintiffs in this case are primarily businesses that provide lawful "clothed, semi-nude, and/or nude performance entertainment." (Mot., ECF No. 12, PageID.475.)  They have been shuttered by the COVID-19 pandemic and the "stay at home" orders issued in response to the pandemic.  They applied for PPP loans and intended to use the borrowed funds primarily to pay their displaced employees.  But because their lawful entertainment was deemed to be of a "prurient sexual nature," the PPP Ineligibility Rule prevented them from obtaining PPP loans and/or from fully participating in the PPP.

Plaintiffs contend, among other things, that the PPP Ineligibility Rule is invalid because it contravenes the PPP. (*See* Am. Compl., ECF No. 11.)  They have now filed a motion seeking a preliminary injunction barring the SBA from enforcing against them the provisions of the PPP Ineligibility Rule that prohibit sexually oriented businesses from obtaining PPP loan guarantees. (*See* Mot., ECF No. 12.)  For the reasons explained below, the motion is **GRANTED**.

# I

## A

The SBA is "a government agency established by § 204 of the Small Business Act of 1953, 67 Stat. 233 (codified in 1958 at 15 U.S.C. § 633)." *United States v. Peoples Household Furnishings, Inc.*, 75 F.3d 252, 253 (6th Cir. 1996). Among other things, the SBA "aid[s], counsel[s], assist[s], and protect[s] … the interests of small-business concerns." *Small Bus. Admin. v. McClelan*, 364 U.S. 446, 447 (1960). The Small Business Act provides the SBA and its Administrator "extraordinarily broad powers to accomplish these important objectives, including [the ability to lend] money to small businesses whenever [those businesses] could not get necessary loans on reasonable terms from private lenders." *Id.* In addition to directly lending money to small businesses, the SBA may guarantee loans made by private lenders. *See id.* The SBA may also "establish general policies" governing the "granting and denial" of the financial assistance it provides. 15 U.S.C. § 633(d).

On January 31, 1996, the SBA first declared certain types of businesses ineligible to participate in SBA lending programs (the "Original SBA Ineligibility Rule"). The Original SBA Ineligibility Rule is codified at 13 C.F.R. § 120.110. The rule prohibits "banks," "[l]ife insurance companies," "businesses primarily engaged in political or lobbying activities," "[b]usinesses deriving more than one-third of gross annual revenue from legal gambling activities," and "[p]rivate clubs and

businesses which limit the number of memberships for reasons other than capacity," among others, from receiving SBA-backed loans. 13 C.F.R. §§ 120.110(b), (f), (g), (i), and (r).  In addition, and most relevant here, the Original SBA Ineligibility Rule prohibits certain sexually oriented businesses from participating in SBA lending programs.  More specifically, it provides that the following businesses are barred from receiving SBA financial assistance:

> (p) Businesses which:
>
> > (1) Present live performances of a prurient sexual nature; or
> >
> > (2) Derive directly or indirectly more than de minimis gross revenue through the sale of products or services, or the presentation of any depictions or displays, of a prurient sexual nature;

120.110(p)(1)-(2).

In 2019, the SBA issued its "Standard Operating Procedure for Lender and Development Company Loan Programs 50 10 5(K)" (the "2019 SOP"). (*See* the 2019 SOP, ECF No. 12-11.)  This publication provides guidance to lenders concerning how to administer and apply the SBA's rules and regulations, including the Original SBA Ineligibility Rule. (*See id.*)  In relevant part, the 2019 SOP explains that "certain business types" may be "ineligible" to participate in SBA loan programs. (*Id.*, PageID.570.)  With respect to businesses that present entertainment

or sell products of a "prurient sexual nature," the 2019 SOP instructs lenders as follows:

> a. A business is not eligible for SBA assistance if:
>
> > i. It presents live or recorded performances of a prurient sexual nature; or
> >
> > ii. It derives more than 5% of its gross revenue, directly or indirectly, through the sale of products, services or the presentation of any depictions or displays of a prurient sexual nature.
>
> b. SBA has determined that financing lawful activities of a prurient sexual nature is not in the public interest. The Lender must consider whether the nature and extent of the sexual component causes the business activity to be prurient.
>
> c. If a Lender finds that the Applicant may have a business aspect of a prurient sexual nature, prior to submitting an application to the LGPC (non-delegated) or requesting a loan number (delegated), the Lender must document and submit the analysis and supporting documentation to the Associate General Counsel for Litigation at PSMReview@sba.gov for a final Agency decision on eligibility. Upon approval by SBA, the Lender may submit the application to the LGPC or may proceed to process the loan under its delegated authority. A non-delegated Lender must submit a copy of SBA's approval with the application to the LGPC. A delegated Lender must retain its analysis, supporting documentation, and evidence of SBA's approval in its loan file and must submit the analysis and supporting documentation to SBA with any request for guaranty purchase. SBA also may review such documentation when conducting Lender oversight activities.

(*Id.*, PageID.571.)

**B**

In March 2020, Congress passed the CARES Act in order to "provide an economic stimulus for our nation's businesses and citizens" affected by the COVID-19 pandemic. *Am. Ass'n of Political Consultants v. U.S. Small Bus. Admin.*, 2020 WL 1935525, at \*1 (D.D.C. Apr. 21, 2020). Title I of the CARES Act focuses on supporting displaced American employees. It is titled the "Keeping American Workers Paid and Employed Act." *See* Pub. L. No. 116-136, 134 Stat. 281 (2020) at Title I. The PPP is within Title I of the CARES Act. *See* 15 U.S.C. § 636(a)(36).

Another federal court recently provided the following succinct and helpful explanation concerning how the PPP operates:

> The PPP is a new loan program to be administered by the SBA under Section 7(a) of the Small Business Act (codified at 15 U.S.C. § 636(a)). Its purpose is to assist small businesses during the COVID-19 crisis by immediately extending them loans on favorable terms. The loans are made by the SBA's participating banks and guaranteed by the SBA itself. Section 1106 of the CARES Act provides that a borrower's indebtedness under a PPP loan will be forgiven to the extent that the borrower uses the funds to pay expenses relating to payroll, mortgage interest, rent, and utilities during the eight-week period following the loan's origination. CARES Act § 1106. If a borrower qualifies for loan forgiveness, the SBA must pay the lender an amount equal to the amount forgiven, plus any interest accrued through the date of payment. *Id.* § 1106(c)(3). However, the SBA has determined that not more than 25% of the loan forgiveness amount may be attributable to non-payroll costs. *See* Business Loan Program Temporary

> Changes; Paycheck Protection Program, 85 Fed. Reg.
> 20,811, 20,813–14 (April 15, 2020).

*Camelot Banquet Rooms, Inc. v. U.S. Small Bus. Admin.*, --- F. Supp. 3d ---, 2020

WL 2088637, at *2 (E.D. Wis. May 1, 2020).

Congress initially "provided the SBA with $349 billion" in PPP loan

guarantees for "small businesses struggling to make ends meet during the COVID-

19 crisis." *Am. Ass'n of Political Consultants*, 2020 WL 1935525, at *1; *see also*

Business Loan Program Temporary Changes; Paycheck Protection Program, 85 Fed.

Reg. at 20812.   The SBA quickly exhausted the initial $349 billion in loan

guarantees, and Congress then appropriated an additional $310 billion for loan

guarantees under the PPP. *See* The Paycheck Protection and Health Care

Enhancement Act, Pub. L. No. 116-139, ---  Stat. ---, § 101(a)(1).   The PPP loan

guarantees are made on a "first-come, first-serve[]" basis. Business Loan Program

Temporary Changes; Paycheck Protection Program, 85 Fed. Reg. at 20813

## C

One section of the PPP is intended to broaden the class of businesses that are

eligible to receive SBA financial assistance.   That section is titled "Increased

Eligibility for Certain Small Businesses and Organizations." 15 U.S.C.

§ 636(a)(36)(D).  The section provides, in relevant part, that "[d]uring the covered

period, in addition to small business concerns, *any* business concern … *shall* be

eligible to receive a covered [*i.e.*, SBA-guaranteed] loan" if the business employs

less than 500 employees or, "if applicable," less than "the size standard in number of employees established by the Administration for the industry in which the business concern … operates." 15 U.S.C. § 636(a)(36)(D)(i)(I)-(II) (emphasis added).

### D

Shortly after the enactment of the PPP, the SBA adopted a set of rules governing the implementation and administration of PPP loan guarantees. *See* Business Loan Program Temporary Changes; Paycheck Protection Program, 85 Fed. Reg. 20811 (Apr. 15, 2020). The PPP Ineligibility Rule is one of those new rules. *See id*. at 20812 (stating rule).

The PPP Ineligibility Rule provides that businesses that "are identified" in the Original SBA Ineligibility Rule and "described further" in the 2019 SOP "are not eligible for PPP loans." *Id.* As noted above, the Original SBA Ineligibility Rule and the 2019 SOP deem ineligible for SBA financing businesses that (1) "[p]resent live performances of a prurient sexual nature" and/or (2) "[d]erive directly or indirectly more than *de minimis* gross revenue through the sale of products or services, or the presentation of any depictions or displays, of a prurient sexual nature." 13 C.F.R. § 120.110.(p)(1)-(2). (*See also* 2019 SOP, ECF No. 12-11, PageID.571.[1]) Thus,

---

[1] The 2019 SOP refers to the Original SBA Ineligibility Rule, but it states slightly different ineligibility criteria. As quoted above, the 2019 SOP provides that "a business is not eligible for SBA assistance" if it (1) presents *either* live "*or recorded*"

these sexually oriented businesses are ineligible to receive PPP loan guarantees under the PPP Ineligibility Rule.

E

Plaintiffs own and operate "venues that present clothed, semi-nude, and/or nude performance entertainment," adult novelty stores, and "businesses that service those establishments." (Mot., ECF No. 12, PageID.475.)  Each Plaintiff alleges that "[n]one of the live performances" at the Plaintiff's establishment – or, for the Plaintiffs that provide services to entertainment establishments, none of the performances at the establishments that Plaintiffs provide services to – are "unlawful or obscene." (Am. Compl. at ¶147, ECF No. 11, PageID.275.)  The Plaintiffs that own or operate entertainment establishments further allege that none of the "entertainers who have performed on [their] premises have ever been charged, let alone convicted, of any crimes of obscenity." (*Id.* at ¶134, PageID.272.)  Finally, the establishment-owning Plaintiffs maintain that they "present[] lawful entertainment in conformity with [their] various licenses, permits, or government approvals." (*Id.* at ¶135, PageID.272.)

---

performances of a prurient sexual nature or (2) derives "more than 5% of its gross revenue" from "the sale of products, services or the presentation of any depictions or displays of a prurient sexual nature." (2019 SOP, ECF No. 12-11, PageID.571; emphasis added.)

Plaintiffs have each had to cease operations for a substantial period of time and/or have lost significant business due to the ongoing COVID-19 pandemic and the various "stay at home" orders issued in the states in which they operate. Due to their financial hardships, they have each sought loans under the PPP. They seek the loans "in order to mitigate [their] business losses and to provide monetary relief to [their] employees." (*Id.* at ¶79, PageID.257.) They intend to spend at least "75% of [the] PPP loans" on "employee wages and salaries." (*Id.*)

Plaintiffs have had different experiences in the PPP loan application process. The Plaintiffs fall into the following categories:

- 33 Plaintiffs have submitted applications and had their applications denied by their local lender because of the PPP Ineligibility Rule (Plaintiffs DB Entertainment, Inc.; Millennium Restaurant Group, Inc.; T and N Incorporated; Burch Management Company, Inc.; JCB of Gainesville, Inc.; MAG Enterprises, Inc.; 2740 Corporation; Brookhurst Venture, LLC; City of Industry Hospitality Venture, Inc.; Farmdale Hospitality Services, Inc.; Inland Restaurant Venture I, Inc.; Midnight Sun Enterprises, Inc.; Olympic Avenue Venture, Inc.; The Oxnard Hospitality Services, Inc.; Platinum SJ Enterprise; Rouge Gentlemen's Club, Inc.; Washington Management, LLC; PNM Enterprises, Inc.; Rialto Pockets, Inc.; Santa Barbara Hospitality Services, Inc.; Santa Maria Restaurant Enterprises, Inc.; The Spearmint Rhino Adult

Superstore, Inc.; High Expectations Hospitality, LLC; Kentucky Hospitality Venture, LLC; K-Kel, Inc.; L.C.M., LLC; Nitelife, Inc.; Penn Ave Hospitality, LLC; Sarie's Lounge, LLC; World Class Ventures, LLC; W.P.B. Hospitality, LLC; The Spearmint Rhino Companies Worldwide, Inc.; and Spearmint Rhino Consulting Worldwide, Inc.);

- 2 Plaintiffs have attempted to submit a loan application but their local lender refused to accept or process the application because of the PPP Ineligibility Rule (Plaintiffs Filosadelfia, LLC and Polmour, Inc.);

- 6 Plaintiffs have submitted loan applications, have not received a decision on their applications, and "reasonably believe" that – because of the PPP Ineligibility Rule – their applications will be rejected and/or delayed until the PPP funds are exhausted (Plaintiffs BDS Restaurant, Inc.; Benelux Corporation; MAG Pitt LP; Stone Park Entertainment, Inc.; Seventy7, LLC; and V.C. Lauderdale, Inc.); and

- 1 Plaintiff has been told its application for a PPP loan will be approved (absent a lack of funding or other unforeseen circumstance) but has also been told that it may not qualify for loan forgiveness because of the PPP Ineligibility Rule (Plaintiff DV Diamond Club of Flint, LLC).

While Plaintiffs' PPP loan applications have been denied by lenders, rather than by the SBA itself, the Plaintiffs have presented evidence that the lenders are

acting in accord with the SBA's view of the PPP Ineligibility Rule. For instance, Plaintiffs have presented evidence that at least one representative of the SBA has opined that a "men's club with strippers" is "definitely not eligible" for a PPP loan. (ECF No. 31-2, PageID.1004.) Moreover, the Plaintiffs have presented evidence that in parallel federal litigation in another district, the SBA has argued that "businesses that feature live entertainment explicitly intended to be 'erotic'" – as most of the Plaintiffs do here – "undoubtedly fall within the plain language of" the PPP Ineligibility Rule. (Motion for Stay filed in *Camelot Banquet Rooms*, *supra*, ECF No. 39-3, PageID.1135.)

## II

This action was initially filed on April 8, 2020, by Plaintiff DV Diamond Club of Flint, LLC, an adult-entertainment establishment located in Flint, Michigan. (*See* Compl., ECF No. 1.) On April 17, 2020, DV Diamond Club and 41 new co-Plaintiffs from across the country filed an Amended Complaint. (*See* Am. Compl., ECF No. 11.) They name as Defendants the SBA, Jovita Carranza (the SBA's Administrator), the United States of America, and Steven Mnuchin (the United States Treasury Secretary). (*See id.*)

In the Amended Complaint, Plaintiffs each broadly allege that:

- They are sexually oriented businesses engaged in lawful conduct;

13

- They have had to close and/or they have lost significant business due to the ongoing COVID-19 pandemic;

- They meet the eligibility requirements identified in the PPP for a PPP loan but have been denied such a loan, fear that they will be denied such a loan, and/or fear that they will be denied loan forgiveness due to the PPP Ineligibility Rule; and

- They plan to use at least 75% of the PPP loan to pay for the salaries and wages of their employees.

Plaintiffs bring three claims in the Amended Complaint. In Count One, Plaintiffs allege that the portions of the PPP Ineligibility Rule excluding sexually oriented businesses from participating in the PPP violate the First Amendment because they are "impermissible content-based restrictions on speech," are "unconstitutionally vague," and "fail to conform to constitutional standards regarding obscenity." (*Id.* at ¶520, PageID.361-362.) In Count Two, Plaintiffs claim that the portions of the PPP Ineligibility Rule excluding sexually oriented businesses from participating in the PPP violate the Fifth Amendment because they "treat establishments presenting certain forms of performance dance entertainment, such as Plaintiff, differently from establishments presenting other forms of entertainment or no entertainment, for no compelling, important, or rational reason" and because they are "impermissibly vague." (*Id.* at ¶523, PageID.363-364.) Finally, in Count

III, Plaintiffs seek to invalidate the PPP Ineligibility Rule under the Administrative Procedures Act. (*See id.* at ¶¶ 526-527, PageID.364; *see also id.* at ¶4, PageID.239, quoting the Administrative Procedures Act.)  In this Count, Plaintiffs allege that the SBA "lacked the authority to promulgate" the PPP Ineligibility Rule because that rule conflicts with the provision of the PPP extending eligibility to any business concern that satisfies the criteria in the statute. (*Id.* at ¶526, PageID.364)

On the same day that Plaintiffs filed their Amended Complaint, Plaintiffs also filed a renewed emergency motion for a temporary restraining order and/or preliminary injunction. (*See* Renewed Mot., ECF No. 12.)  The arguments Plaintiffs make in the renewed motion largely track the claims made in the Amended Complaint. (*See id*.)  Plaintiffs ask the Court, among other things, to bar the Defendants from enforcing against them the portions of the PPP Ineligibility Rule that prohibit sexually oriented businesses from obtaining PPP loan guarantees and/or from having PPP loans forgiven. (*See id.*, PageID.504.)

Following an on-the-record status conference with counsel for all parties, the Court set an expedited briefing schedule on Plaintiffs' renewed emergency motion. (*See* Order, ECF No. 18.)  Defendants filed their response to the motion on April 24, 2020 (*see* Resp. Br., ECF No. 25), and Plaintiffs filed a reply (*see* Reply Br., ECF No. 28).

While Plaintiffs' renewed emergency motion was being briefed, three new parties, 689 Eatery Corp., 725 Eatery Corp., and GJJM Enterprises, Inc. (the "Intervenors") filed a motion to intervene as co-plaintiffs in this action. (*See* Mot. to Intervene, ECF No. 22.)  The Intervenors are sexually oriented businesses that are "similarly situated" to the original Plaintiffs. (*Id*., PageID.648.)  The Defendants did not object to the Intervenors joining this action, and the Court orally granted the motion to intervene on April 30, 2020.  The Intervenors have filed their own emergency motion seeking the same relief as Plaintiffs. (*See* Intervenors' Mot., ECF No. 23.)  The Intervenors' motion "adopt[ed] the arguments" made in Plaintiffs' emergency motion. (*Id.*, PageID.684-685.)

On April 30, 2020, the Court held a hearing on the emergency motions for a preliminary injunction.  It held a continuation of the hearing on May 5, 2020.

### III

The Court begins with a threshold question: may the Court enter preliminary injunctive relief against the SBA?  Defendants say that the answer is "no."  They insist that Section 634(b)(1) of the Small Business Act bars courts from entering injunctions against the SBA and its Administrator. (*See* Resp. Br., ECF No. 24, PageID.730, quoting 15 U.S.C. § 634(b)(1).)  That statute provides that:

> In the performance of, and with respect to, the functions, powers, and duties vested in him by this chapter the Administrator may sue and be sued in any court of record of a State having general jurisdiction, or in any United

States district court, and jurisdiction is conferred upon such district court to determine such controversies without regard to the amount in controversy; **but no attachment, injunction, garnishment, or other similar process, mesne or final, shall be issued against the Administrator or his property.**

15 U.S.C. § 634(b)(1) (emphasis added).

The United States District Court for the Eastern District of Wisconsin recently held that this statute does not preclude the precise award of injunctive relief that Plaintiffs seek against the SBA here. *See Camelot Banquet Rooms*, 2020 WL 2088637, at ** 3-4. That court explained:

> I conclude that § 634(b)(1) does not preclude injunctive relief against the SBA in a case such as this. Provisions like it are found in other federal statutes creating agencies that participate in commercial activity. These statutes allow the agency to be sued but specifically provide that "no attachment, injunction, garnishment, or other similar process, mesne or final, shall be issued against the [agency] or [its] property." *See* 19 U.S.C. § 1920; 42 U.S.C. § 3211(a)(13); 15 U.S.C. § 714b(c); 19 U.S.C. § 2350; 7 U.S.C. 1506(d); 20 U.S.C. § 1082(a)(2). As the United States Claims Court explained, *see Related Industries, Inc. v. United States*, 2 Cl.Ct. 517, 522 (1983), Congress began including such language in its statutes after the Supreme Court decided *Federal Housing Administration v. Burr*, 309 U.S. 242, 60 S.Ct. 488, 84 L.Ed. 724 (1940). In that case, the Court held that a clause allowing the Federal Housing Administration to sue and be sued rendered it subject to a state-law garnishment action. The Court reasoned that "it must be presumed that when Congress launched a governmental agency into the commercial world and endowed it with authority to 'sue or be sued', that agency is not less amenable to judicial process than a private enterprise under like circumstances

would be." *Id.* at 245, 60 S.Ct. 488. The Court indicated that, if Congress intends to limit the kinds of relief available against an agency that acts in commerce, it must do so clearly. *Id.* Thus, after *Burr*, Congress began specifying that certain agencies that participated in commerce are not subject to attachment, injunction, garnishment, and similar process.

As the First Circuit has recognized, this limitation on garnishment and similar process was "intended to keep creditors or others suing the government from hindering and obstructing agency operations through mechanisms such as attachment of funds." *Ulstein Maritime, Ltd. v. United States*, 833 F.2d 1052, 1056–57 (1st Cir. 1987). It was not intended to render the agency immune from injunctive relief in situations where the agency has exceeded its statutory authority and where an injunction would not interfere with the agency's internal operations. *Id.* at 1057. Indeed, if provisions such as § 634(b)(1) meant that the agency could never be enjoined, then an agency could adopt unconstitutional policies and continue to follow them even after a court declared them unconstitutional. For example, the SBA could adopt a policy stating that it will extend small business loans only to companies owned by white men. If § 634(b)(1) means that the SBA may never be enjoined, then a court could not enjoin this policy, even though it would be blatantly unconstitutional.

In the present case, the plaintiffs only seek to set aside unlawful agency action. They do not seek to attach the SBA's assets or otherwise interfere with its internal operations. Under the injunction the plaintiffs seek, the SBA would have to do no more than process the plaintiffs' loan applications in the same manner that it processes the applications of other small businesses. Section 634(b)(1) does preclude the court from entering such an injunction.

*Id.*[2]

For the reasons cogently explained by the district court in *Camelot Banquet Rooms*, the Court is persuaded that injunctive relief is available to Plaintiffs. As in that case, the Plaintiffs here seek only "to set aside unlawful agency action. They do not seek to attach the SBA's assets or otherwise interfere with its internal operations." *Id.* at *4. Moreover, Defendants themselves candidly acknowledge that courts "have held that [Section 634(b)(1)] does not necessarily bar injunctions against the SBA in all circumstances." (Resp. Br., ECF No. 24, PageID.730.) Finally, as in *Camelot Banquet Rooms*, Plaintiffs have sued both the United States and Steven Mnuchin in his official capacity as Secretary of the Treasury, and those Defendants "do not claim to be immune from injunctive relief; nor do they claim that they could not grant the plaintiffs access to the PPP unless the SBA were also enjoined." *Camelot Banquet Rooms*, 2020 WL 2088637, at *3. For all of these reasons, the Court concludes that it may enter the requested injunctive relief against the SBA.

---

[2] In *American Association of Political Consultants*, *supra*, the plaintiffs sought an injunction barring the SBA from excluding lobbying businesses from the PPP. The district court in that case did not squarely decide whether it had the authority to issue the requested injunction. But it did observe that the "D.C. Circuit … at a minimum [] 'strongly intimated that injunctive relief is available ... when the SBA exceeds its statutory authority.'" *Am. Ass'n of Political Consultants*, 2020 WL 1935525, at *6 (quoting *Elk Assocs. Funding Corp. v. U. S. Small Bus. Admin.*, 858 F. Supp. 2d 1, 20 (D.D.C. 2012)).

# IV

A preliminary injunction "is an extraordinary and drastic remedy." *S. Glazer's Distribs. of Ohio v. Great Lakes Brewing Co.*, 860 F.3d 844, 849 (6th Cir. 2017) (quoting *Munaf v. Geren*, 553 U.S. 674, 689–90 (2008)). Although the movant "is not required to prove his case in full at a preliminary injunction hearing," *Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 542 (6th Cir. 2007), a preliminary injunction should not "be granted lightly." *S. Glazer's*, 860 F.3d at 849.

A district court balances four factors when considering a motion for a preliminary injunction or a temporary restraining order: "(1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury absent the injunction; (3) whether the injunction would cause substantial harm to others; and (4) whether the public interest would be served by the issuance of an injunction." *Id.* (quotations omitted). "The last two factors (the balance of equities and public interest) 'merge when the Government is the opposing party.'" *Am. Ass'n of Political Consultants*, 2020 WL 1935525, at *2 (quoting *Nken v. Holder*, 556 U.S. 418, 435 (2009)).

"[T]hese are factors to be balanced, not prerequisites to be met." *S. Glazer's*, 860 F.3d at 849. "[N]o one factor is controlling." *Gonzales v. Nat'l Bd. of Med. Exam'rs*, 225 F.3d 620, 625 (6th Cir. 2000).

## V

The Plaintiffs have shown a strong likelihood that they will prevail on the merits of their claim that the PPP Ineligibility Rule is invalid.  As explained below, Plaintiffs have demonstrated that the rule cannot stand because it directly conflicts with the PPP.

## A

The Administrative Procedures Act prohibits agencies from taking action "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(C).  This Court "review[s] the propriety of agency action under the two-step framework set forth in *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984)." *Tenn. Hosp. Ass'n v. Azar*, 908 F.3d 1029, 1037 (6th Cir. 2018).

At step one of a *Chevron* analysis, a court asks whether "Congress has directly spoken to the precise question at issue." *Chevron*, 467 U.S. at 842.  To answer this question, "courts must determine whether the statute is ambiguous, applying the ordinary tools of statutory construction.  If the statute is unambiguous, then the court applies it as-written; that is the end of the matter." *Arangure v. Whitaker*, 911 F.3d 333, 337-38 (6th Cir. 2018) (internal quotation marks and citation omitted). If Congress has spoken to the precise question at issue, then "the reviewing court must give effect to the will of Congress irrespective of any contrary agency

interpretation." *Mid–Am. Care Found. v. N.L.R.B.*, 148 F.3d 638, 642 (6th Cir. 1998). However, if the statute is ambiguous, then (and only then) does the court move to step two of the *Chevron* analysis. At that step, a court must "defer to the agency's construction if it is 'permissible'—*i.e.*, 'within the bounds of reasonable interpretation.'" *Arangure*, 911 F.3d at 338 (quoting *City of Arlington v. F.C.C.*, 569 U.S. 290, 296 (2013)).

The Sixth Circuit recently emphasized that a district court must work hard at *Chevron*'s first step to determine a statute's meaning before finding that a statute is ambiguous and deferring to an agency's interpretation:

> *Chevron*'s first step is grounded in a recognition that "[t]he judiciary is the final authority on issues of statutory construction." *Chevron*, 467 U.S. at 843 n.9, 104 S.Ct. 2778. This means courts must do their best to determine the statute's meaning before giving up, finding ambiguity, and deferring to the agency. When courts find ambiguity where none exists, they are abdicating their judicial duty. *Cf.* Kent Barnett & Christopher J. Walker, Chevron *in the Circuit Courts*, 116 Mich. L. Rev. 1, 33–34 (2017) (concluding that circuit courts find ambiguity at *Chevron* step one 70% of the time, based on a sample of over 1,000 cases). This abdication by ambiguity impermissibly expands an already-questionable *Chevron* doctrine. *See Voices for Int'l Bus. & Educ., Inc. v. NLRB*, 905 F.3d 770, 780–81 (2018) (Ho, J., concurring) ("Finding ambiguity where it does not exist—granting deference where it is not warranted ... misuse[s] *Chevron*" and "abrogates separation of powers without even the fig leaf of Congressional authorization."). Unsurprisingly, when courts neglect their duty, the Supreme Court has not hesitated to reverse. *See, e.g.*, *Pereira*, 138 S.Ct. at 2113–14 ("[T]he Court need not

resort to *Chevron* deference, as some lower courts have done, for Congress has supplied a clear and unambiguous answer to the interpretive question at hand."); *id.* at 2120 (Kennedy, J., concurring) (chiding lower courts for "engag[ing] in cursory analysis" in *Chevron* step one and rushing to "reflexive deference"); *Kingdomware Techs., Inc. v. United States*, —— U.S. ——, 136 S.Ct. 1969, 1979, 195 L.Ed.2d 334 (2016) (reversing lower court's *Chevron*-based decision because the statute was unambiguous); *United States v. LaBonte*, 520 U.S. 751, 762, 117 S.Ct. 1673, 137 L.Ed.2d 1001 (1997) (same). In short, *Chevron*'s first step is not a free pass.

*Arangure*, 911 F.3d at 337-38 (internal footnote omitted).

## B

The Court begins its *Chevron* step one analysis by identifying the "precise question" presented.  Here, that question is:

> May the SBA exclude from eligibility for a PPP loan guarantee a business concern that (1) during the covered period (2) has less than 500 employees or less than the size standard in number of employees established by the Administration for the industry in which the business operates?

For the reasons explained below, the Court finds that Congress has unambiguously answered: no.

## 1

First, the text of the PPP makes clear that every business concern meeting the statutory criteria is eligible for a PPP loan during the covered period.  Congress identified in the PPP only two criteria that a business concern must satisfy in order

to qualify for loan guarantee eligibility: (1) during the covered period (2) it must have less than 500 employees or less than the size standard in number of employees established by the Administration for the industry in which the business operates. Under the settled *expressio unius exclusio alterius* rule of statutory construction, Congress's express listing of these two eligibility criteria indicates that Congress did not intend there to be any other criteria for loan guarantee eligibility. *See*, *e.g.*, *Terry v. Tyson Farms, Inc.*, 604 F.3d 272, 283 (6th Cir. 2010) (explaining in the context of statutory interpretation that "the germane maxim *expressio unius est exclusio alterius*" means "the expression of one thing is the exclusion of others"). After establishing only two criteria for loan guarantee eligibility, Congress provided that "*any* business concern … shall be eligible to receive a covered [*i.e.*, SBA guaranteed] loan" if it meets those criteria. 15 U.S.C. § 636(a)(36)(D)(i) (emphasis added). "[T]he word 'any' naturally carries 'an expansive meaning.'" *SAS Inst., Inc. v. Iancu*, --- U.S. ---, 138 S. Ct. 1348, 1354 (2018) (quoting *United States v. Gonzales*, 520 U.S. 1, 5 (1997)). And "[w]hen used (as here) with a 'singular noun in affirmative contexts,' the word 'any' ordinarily 'refer[s] to a member of a particular group or class without distinction or limitation' and in this way 'impl[ies] *every* member of the class or group.'" *Id*. (emphasis in original) (quoting Oxford English Dictionary (3d ed., Mar. 2016), www.oed.com/view/Entry/8973 (OED)). Thus, when Congress said that "any business concern" employing the

requisite number of Americans during the covered period "shall be eligible" for a PPP loan guarantee, it meant that *all* such businesses are eligible for a loan guarantee.

The Supreme Court reached a similar conclusion in *SAS Institute*, *supra*. In that case, the Supreme Court was called upon to interpret a statute concerning "*inter partes* review" of a challenged patent by the United States Patent Office. That statute, 35 U.S.C. § 318(a), provided in relevant part that "[i]f an *inter partes* review is instituted and not dismissed under this chapter, the [Board] *shall issue* a final written decision with respect to the patentability of *any patent claim challenged by the petitioner*...." *SAS Inst.*, 138 S. Ct. at 1354 (emphasis in original) (quoting § 318(a)). Notwithstanding this language, the Patent Office contended that it had discretion to render a decision on less than all of the claims challenged by a petitioner. The Supreme Court disagreed:

> We find that the plain text of § 318(a) supplies a ready answer. It directs that "[i]f an *inter partes* review is instituted and not dismissed under this chapter, the [Board] *shall issue* a final written decision with respect to the patentability of *any patent claim challenged by the petitioner*...." § 318(a) (emphasis added). This directive is both mandatory and comprehensive. The word "shall" generally imposes a nondiscretionary duty. See *Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26, 35, 118 S.Ct. 956, 140 L.Ed.2d 62 (1998). And the word "any" naturally carries "an expansive meaning." *United States v. Gonzales*, 520 U.S. 1, 5, 117 S.Ct. 1032, 137 L.Ed.2d 132 (1997). When used (as here) with a "singular noun in affirmative contexts," the word

"any" ordinarily "refer[s] to a member of a particular group or class without distinction or limitation" and in this way "impl[ies] *every* member of the class or group." Oxford English Dictionary (3d ed., Mar. 2016), www.oed.com/view/Entry/8973 (OED) (emphasis added) (all Internet materials as last visited Apr. 20, 2018). So when § 318(a) says the Board's final written decision "shall" resolve the patentability of "any patent claim challenged by the petitioner," it means the Board *must* address *every* claim the petitioner has challenged.

*Id.* at 1354. The Supreme Court further held that because the statute unambiguously required the Patent Office to review all challenged claims, the Office's contrary construction was not entitled to any deference under *Chevron*. *See id.* at 1358.

*SAS Institute* guides the way here. The PPP, like the *inter partes* review statute at issue in *SAS Institute*, combines the expansive term "any" with the mandatory directive "shall." And, just as Congress's use of those terms in the *inter partes* review statute required the Patent Office to review every challenged patent claim, Congress's use of those terms in the PPP requires the SBA to deem eligible for a PPP loan guarantee every business concern that employed the specified number of Americans during the covered period. This reading of the PPP effectuates Congress's two stated intentions (as reflected in the name of Title I of the CARES Act and in the caption of the relevant section of the PPP): to "Keep[] American Workers Paid and Employed" and to "[i]ncrease[] [e]ligibility" for businesses to

participate in the PPP. *See* Pub. L. No. 116-136, 134 Stat. 281 (2020) at Title I; *see also* 15 U.S.C. § 636(a)(36)(D).

The Court recognizes that the Supreme Court has not always adopted the construction of "any" that it employed in *SAS Institute*. The Supreme Court has noted that "'[a]ny' can and does mean different things depending on the setting" and has explained that, at times, in order "[t]o get at Congress's understanding [of 'any'], what is needed is a broader frame of reference." *Nixon v. Mo. Mun. League*, 541 U.S. 125, 132 (2004).[3] In these instances, "[i]t helps if we ask how Congress could have envisioned" the statutory provision at issue "actually working" if "any" is given its natural broad meaning. *Id.* Taking this approach to understanding "any," however, yields the same result as the *SAS Institute* approach to the term. Indeed, construing the term broadly, as the Court has done, results in the PPP "actually working" in the manner that Congress, by all indications, intended – as providing

---

[3] One "setting" that has led the Supreme Court to depart from the *SAS Institute* construction of "any" is when neighboring statutory terms demand a narrower construction. *See, e.g.*, *Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 115-16 (2001) (applying narrow construction of "any other class of workers engaged in … commerce" in light of Court's previous interpretation of "in commerce" as a term of art with a narrower meaning). No neighboring term here demands such a construction.

temporary paycheck support to as many displaced and suffering American workers as possible.[4]

For all of these reasons, the plain language of the PPP makes clear that any business concern is eligible for a PPP loan if it employed the requisite number of Americans during the covered period.   Thus, the Defendants may not exclude Plaintiffs from participating in the PPP on the ground that they present entertainment or sell products of a "prurient sexual nature."

## 2

The context in which Congress enacted the PPP further confirms the Court's reading of the PPP loan guarantee eligibility provisions.  By the time Congress created the PPP, the SBA had been applying the Original SBA Ineligibility Rule – and excluding numerous business from receiving SBA financial assistance – for nearly 25 years.  And just one year before Congress enacted the PPP, the SBA reiterated – in the 2019 SOP – the exclusions it had been applying through the Original SBA Ineligibility Rule.

Congress is "presumed to [have been] aware of" the Original SBA Ineligibility Rule and the 2019 SOP "when it passe[d]" the PPP. *Patel v. U.S.*

---

[4] The Court further acknowledges that "any" should not be construed broadly where such a construction would lead to an "absurd result." *Nixon*, 541 U.S. at 138 (citing *United States v. Am. Trucking Ass'n, Inc.*, 310 U.S. 534, 543 (1940)).  But as explained in detail below (*see* Section (V)(C)(2), *infra*), the Court's construction of "any" here does not cause such a result.

*Citizenship & Immigration Servs.*, 2016 WL 795925, at *13 (E.D. Mich. Mar. 1, 2016) (citing *Goodyear Atomic Corp. v. Miller*, 486 U.S. 174, 184-85 (1988)).[5] Congress nonetheless provided in the PPP that "*any* business concern … shall be eligible" for a loan guarantee if it employed the requisite number of Americans during the covered period. 15 U.S.C. § 636(a)(36)(D)(i) (emphasis added).  That is a clear indication that Congress did not want the SBA's existing eligibility limitations to be imported wholesale into the PPP.  Indeed, if Congress had intended to permit the SBA to apply its existing eligibility limitations, Congress could easily have provided that "any *otherwise eligible* business concern" employing the requisite number of Americans during the covered period would be eligible for a PPP loan.  It did not.   This confirms that the SBA may not apply to the PPP its historical limitation against supporting businesses of a "prurient sexual nature."

---

[5] *See also Reasonable Consideration*, 2A Sutherland Statutory Construction § 45:12 (7th ed.) (confirming that courts may "presume[e]" that Congress is "aware of existing … relevant … administrative decisions" when passing legislation). Defendants themselves have acknowledged this point.  In parallel litigation in another district, the Defendants have argued that it is "reasonable to assume that Congress was aware of" the SBA Ineligibility Rule when it enacted the PPP. (Motion for Stay filed in *Camelot Banquet Rooms*, *supra*, ECF No. 39-3, PageID.1135.)

### C

The Defendants resist the Court's conclusion that the PPP Ineligibility Rule conflicts with the PPP.   While the Defendants' arguments are thoughtful and effectively presented, they do not persuade the Court that the PPP Ineligibility Rule may stand.

### 1

The Defendants begin with a series of textual arguments.   They contend that several provisions of the PPP demonstrate Congress's intent to allow the SBA to apply its existing eligibility limitations to the PPP.   The Court respectfully declines to adopt the Defendants' reading of these provisions.

### a

Defendants first cite the provision of the PPP that states: "*Except as otherwise provided in this paragraph*, the [SBA] may guarantee covered loans under the same terms, conditions, and processes as a loan made under this subsection." (Resp. Br., ECF No. 24, PageID.729; quoting 15 U.S.C. § 636(a)(36)(B) (emphasis in Defendants' response).)   Defendants contend that (1) the SBA's historical limitations on eligibility for financial assistance (*i.e.*, the eligibility limitations in the Original SBA Ineligibility Rule and the 2019 SOP) are part of the "terms, conditions, and processes" that apply to PPP loan guarantees and (2) no provision of the PPP "otherwise provide[s]" that the SBA may not apply these limitations to PPP loan

guarantees.   Thus, Defendants conclude, the SBA may continue to apply these eligibility limitations to PPP loan guarantees.

The flaw in this argument is that another provision of the PPP *does* "otherwise provide[]" that the SBA may not import its historical eligibility limitations into the PPP.   As explained in detail above, the provision of the PPP that specifically addresses eligibility bars the SBA from doing so.   Again, that section provides that "*any* business concern" employing the requisite number of Americans during the covered period "shall be eligible" for a loan guarantee. 15 U.S.C. § 636(a)(36)(D)(i) (emphasis added).   Through that language, Congress "otherwise provide[d]" that the SBA may not apply to PPP loan guarantees the eligibility limitations from the Original SBA Ineligibility Rule and/or the 2019 SOP.

**b**

Defendants next cite a provision of the PPP that specifically references certain SBA regulations and deems those regulations inapplicable to the PPP.   The provision to which Defendants refer, 15 U.S.C. § 636(a)(D)(iv), says:

> During the covered period, *the provisions applicable to affiliations under section 121.103 of title 13, Code of Federal Regulations, or any successor regulation, are waived* with respect to eligibility for a covered loan for—
>
> (I)   any business concern with not more than 500 employees that, as of the date on which the covered loan is disbursed, is assigned a North American Industry Classification System code beginning with 72;

> (II)  any business concern operating as a franchise that is assigned a franchise identifier code by the Administration; and
>
> (III)  any business concern that receives financial assistance from a company licensed under section 681 of this title.

15 U.S.C. § 636(a)(D)(iv)(I)-(III) (emphasis added).  The regulations waived by this provision – *i.e.*, the regulations found in "section 121.103 of title 13, Code of Federal Regulations" – concern how to determine the size of a business concern.  More specifically, the waived regulations, among other things, (1) explain how to determine whether two entities are "affiliates" and (2) provide that affiliates will be a treated as a single entity when "determining [a] concern's size." 13 C.F.R. §§ 121.103(a)(1) and (a)(6). Defendants contend that under the *expressio unius* canon of statutory construction, Congress's express waiver of these size-determination regulations indicates Congress's intent that the SBA *could* incorporate other existing regulations – such as the Original SBA Ineligibility Rule and the 2019 SOP – into the PPP program. (*See* Resp. Br., ECF No. 24, PageID.729.)

Defendants stretch the *expressio unius* canon too far.  They apply it to a statutory provision that has nothing to do with the substantive criteria for PPP loan eligibility in an effort to overcome Congress's clear expression of those criteria in another provision.  Simply put, Congress's statement in one provision that size-determining regulations do not apply to PPP loan guarantees does not – by virtue of the *expressio unius* canon – overcome Congress's unambiguous statement in another

provision that the sole requirements for PPP loan guarantee eligibility are that (1) during the covered period (2) a business concern has less than the specified number of employees.

c

Finally, during the continued hearing on Plaintiffs' injunction motion, the Defendants argued that the provision of the PPP on which the Court rested its analysis actually supports their view that the SBA may exclude from the PPP businesses that present entertainment or sell products of a "prurient sexual nature." This argument is easiest to understand when broken down into the following steps:

> Step 1:  Before Congress enacted the PPP, the Original SBA Ineligibility Rule excluded from SBA financial assistance programs (1) nonprofit organizations and (2) a variety of businesses, including, for instance, banks, political lobbying firms, certain private clubs with restrictive admissions practices, and businesses that present entertainment or sell products of a "prurient sexual nature."

> Step 2: In the PPP provision cited by the Court, Congress specifically provided that "nonprofit organization[s]" are eligible for PPP loan guarantees if, during the covered period, they employed the requisite number of employees. *See* 15 U.S.C. 636(a)(36)(D)(i).  This shows that Congress was aware of the Original SBA Ineligibility Rule and knew how to extend eligibility to the entities excluded by that rule if it wished to do so.

> Step 3:  In the PPP provision cited by the Court, Congress did not specifically say that any other businesses excluded by the Original SBA Ineligibility Rule are eligible for PPP loan guarantees.

> Step 4:      If Congress had intended to make any of the other previously excluded businesses eligible for PPP loan guarantees, it

would have specifically said so – just as it did with nonprofit organizations.

> Step 5:    Because Congress did not specifically say that any of the other previously excluded businesses are eligible for PPP loan guarantees, it necessarily follows that Congress did not intend to extend eligibility to any of those businesses, including businesses that present entertainment or sell products of a "prurient sexual nature."

This argument ignores that Congress had no need to individually identify the previously excluded businesses in the PPP because it conferred eligibility on "any business concern" – a term that encompasses all of those businesses. Indeed, using the general term "any business concern" was a much more efficient way of conferring eligibility on previously excluded businesses than specifically listing each of those businesses one-by-one. Moreover, it made sense for Congress to specifically confer eligibility on "nonprofit organizations" at the same time it used the broad term "any business concern" to confer eligibility on the previously excluded businesses. It was necessary to separately and specifically identify nonprofit "organizations" because not all such organizations would fall within the broad category of "any business concern." For all of these reasons, the fact that Congress did not specifically confer PPP eligibility on businesses that present entertainment or sell products of a "prurient sexual nature" does not mean that the SBA deny PPP loan guarantees to those businesses.

**2**

In addition to their textual arguments, Defendants contend that the Court's construction of the PPP will lead to absurd results that Congress could not have intended. The Defendants insist, for instance, that Congress could not possibly have intended to support the businesses that have historically been denied SBA financing under the Original SBA Ineligibility Rule – including certain sexually oriented businesses, private clubs that discriminate, and political lobbying firms. While this argument has some initial surface appeal, it does not withstand closer scrutiny.

Defendants are correct that it would ordinarily be absurd to conclude that Congress meant to provide financial assistance to, among others, certain sexually oriented businesses and private clubs that discriminate. But these are no ordinary times, and the PPP is no ordinary legislation. The COVID-19 pandemic has decimated the country's economy, and the PPP is an unprecedented effort to undo that financial ruin. More importantly, the PPP is an effort to protect American *workers* – as noted above, it is located within a Title of the CARES Act named the "Keeping American Workers Paid and Employed Act" – and Congress could rationally have concluded that those workers need protection no matter the line of business in which they work. From this perspective, Congress's decision to expand funding to previously ineligible businesses is not an endorsement or approval of those businesses. Instead, it is a recognition that in the midst of this crisis, the

workers at those businesses have no viable alternative options for employment in other, favored lines of work and desperately need help.  It is not absurd to conclude that in order to support these workers, Congress temporarily permitted previously excluded businesses to obtain SBA financial assistance.[6]

Notably, the SBA itself seems to recognize that Congress is willing to extend PPP loan guarantees to businesses that were previously excluded from receiving SBA financial assistance.  The Original SBA Ineligibility Rule deemed ineligible for SBA funding any business that "deriv[es] more than one-third of gross annual revenue from legal gambling activities." 13 C.F.R. § 120.110(g).  Yet, on April 28, 2020, the SBA decided to allow these businesses to receive PPP loan guarantees. *See* Business Loan Program Temporary Changes; Paycheck Protection Program – Requirements – Promissory Notes, Authorizations, Affiliation, and Eligibility, 85 Fed. Reg. 23450, 23451 (Apr. 28, 2020).  The SBA explained that it would allow gambling businesses to participate in the PPP because it "*believes this approach is more consistent with the policy aim of making PPP loans available to a broad segment of U.S. businesses*." *Id.* (emphasis added).  Thus, even the SBA recognizes Congress's willingness to support employees in lines of business that were previously disfavored.  This further undercuts the Defendants' argument that the

---

[6] The PPP is a short-term program.  The "covered period" during which SBA guaranteed loans are available began on February 15, 2020, and ends on June 30, 2020. *See* 15 U.S.C. § 636(a)(36)(A)(iii).

Court's construction of the PPP here would lead to an absurd result that Congress could not have intended.

For all of these reasons, the Court's construction of the PPP does not yield an absurd result.[7]

## D

For all of the reasons explained above, the Court concludes under step one of *Chevron* that the PPP Ineligibility Rule conflicts with the PPP and is therefore invalid.[8]   Accordingly, Plaintiffs have shown a substantial likelihood of success on

---

[7] The PPP Ineligibility Rule bars "businesses engaged in illegal activity" and "businesses located in a foreign country" from obtaining PPP loans. *See* Business Loan Program Temporary Changes; Paycheck Protection Program, 85 Fed. Reg. 20811, 20812 (April 15, 2020) (stating illegibility rule and incorporating 13 C.F.R. §§ 120.110(e), (h)).  Though the Court deems the rule invalid, these two eligibility limitations from the rule are inherent in the PPP itself and do not depend upon the continued validity of the rule.  First, all federal spending statutes – including the PPP – necessarily limit spending to lawful pursuits even without specifying that limitation.  Second, the term "any business concern" in the PPP is naturally read in light of the "ordinary assumption" that a statute passed by Congress "applies domestically, not extraterritorially." *Small v. United States*, 544 U.S. 385, 391 (2005) (holding, in light of that "ordinary assumption," that the term "convicted in any court" does not include convictions in foreign courts).  Thus, the Court's conclusion that the PPP Ineligibility Rule may not be enforced does not lead to the absurd result that PPP loans must be extended to businesses committing crimes or businesses located outside the United States.

[8] The Plaintiffs have consistently argued that the PPP Ineligibility Rule is invalid because it purports to establish limits on PPP loan guarantee eligibility that conflict with the eligibility provisions of the PPP. (*See*, *e.g.*, Am. Compl. at ¶¶ 526-27, ECF No. 11, PageID.364.)  When Plaintiffs first made that argument, they identified the eligibility provisions of the PPP as those set forth in 15 U.S.C. § 636(a)(36)(F)(ii)(II).  That section provides: "In evaluating the eligibility of a

their claim that the SBA may not enforce against them the provision of the rule excluding from eligibility for a PPP loan businesses that present entertainment or sell products of a "prurient sexual nature."[9]

## VI

The Court now turns to the remaining preliminary injunction factors – irreparable harm, the balance of harms, and the public interest.  Each factor favors the issuance of preliminary injunctive relief here.

To begin, Plaintiffs have established that they will suffer irreparable harm in the absence of an injunction.  Indeed, Plaintiffs have shown that if the Court does

---

borrower for a covered loan with the terms described in this paragraph, a lender shall consider whether the borrower – (aa) was in operation on February 15, 2020; and (bb)(AA) had employees for whom the borrower paid salaries and payroll taxes; or (BB) paid independent contractors, as reported on a Form 1099-MISC." 15 U.S.C. § 636(a)(36)(F)(ii)(II)(aa)-(bb)(AA)-(BB).  The Court does not believe that this section establishes the substantive eligibility criteria for a PPP loan.  This section is best understood as directing lenders as to what they should consider in determining whether the eligibility factors – which are set forth in 15 U.S.C. § 636(a)(36)(D)(i) – have been satisfied.  During the continuation of the hearing on May 5, 2020, the Court discussed with Defendants' counsel its view that the PPP eligibility criteria are set forth in 15 U.S.C. § 636(a)(36)(D)(i) and offered counsel the opportunity to respond to that view.

[9] The United States District Court for the Eastern District of Wisconsin reached the same conclusion in *Camelot Banquet Rooms*, *supra*.  However, the court in *Camelot Banquet Rooms* rested its holding on a different statutory provision than the one discussed at length by the Court above. *See Camelot Banquet Rooms*, 2020 WL 2088637, at *7 (citing 15 U.S.C. § 636(a)).  While the Court agrees with and finds the reasoning of the Wisconsin district court persuasive, the Court chooses to rest its analysis primarily on the statutory provision discussed at length above.

not grant preliminary injunctive relief, there may be no relief at all available to them. The PPP is a short-term program with limited loan guarantees that are offered "on a first-come, first-served basis. Once the funds Congress appropriated for the PPP are exhausted, the SBA will be unable to guarantee further loans." *Camelot Banquet Rooms*, 2020 WL 2088637, at *11. Because PPP loan guarantees are being exhausted so quickly, there is a substantial likelihood that without injunctive relief, the Plaintiffs will be "permanently excluded from the PPP." *Id.* And Plaintiffs would have no monetary remedy for such an exclusion because Defendants have sovereign immunity from any claim for monetary damages. As the federal district court explained in *Camelot Banquet Rooms*, "the inability to obtain damages implies that any harm the plaintiffs suffer between now and the end of the case will be irreparable":

> I note that the government does not concede that it could be held liable for damages at the end of this case. Ordinarily, the federal government and its officials sued in their official capacities (as they are sued here) have sovereign immunity from damages. *See, e.g.*, *FDIC v. Meyer*, 510 U.S. 471, 475, 114 S.Ct. 996, 127 L.Ed.2d 308 (1994). No party has suggested that the federal government has waived its sovereign immunity from damages under the present circumstances. Moreover, the Tenth Circuit has held that the Small Business Act's sue-and-be-sued clause, 15 U.S.C. § 634(b)(1), does not render the SBA liable for damages in a suit involving the SBA's refusal to guarantee a small business loan. *See Ascot Dinner Theatre, Ltd. v. Small Bus. Admin.*, 887 F.2d 1024, 1027–28 (10th Cir. 1989). Thus, I assume for purposes of this motion that the plaintiffs could not obtain damages for

> any harm caused by the SBA's refusal to guarantee their loans. The plaintiffs therefore lack an adequate remedy at law. Moreover, the inability to obtain damages implies that any harm the plaintiffs suffer between now and the end of the case will be irreparable. *See Smith v. City of Hammond, Ind.*, 388 F.3d 304, 307 (7th Cir. 2004) (noting that in some cases "a defendant's immunity from damages liability might constitute irreparable harm entitling the plaintiff to preliminary relief").

*Id.*

And even if Defendants did not enjoy sovereign immunity, it would appear that Plaintiffs would still lack an adequate remedy.  There is a substantial risk that Plaintiffs will lose their businesses if they do not obtain PPP loans now.  Plaintiffs' businesses involve relatively close contact between (1) certain staff (*i.e.*, servers, bus staff, bartenders, valet team, *etc.*) and patrons and (2) groups of patrons.  Thus, Plaintiffs' businesses will almost certainly be the last ones to be permitted to return to anything close to normal operations.  In the meantime, they will continue to suffer large – and potentially unsustainable – losses.  Indeed, "as a general matter, it is reasonable to infer that *any* small business, regardless of the services and/or products it provides, would have trouble surviving if forced to close its doors for two months followed by a limited, piecemeal reopening." *Id.* at *12 (emphasis in original).  And "[t]he loss or destruction of an entire business" that Plaintiffs face here has "widely been held to constitute irreparable harm, at least when the business has been in

operation for some time." *Truglia v. KFC Corp.*, 692 F. Supp. 271, 279 (S.D.N.Y. 1988), *aff'd*, 875 F.2d 308 (2d Cir. 1989).

Next, the balance of harms and public interest factors also favor the granting of a preliminary injunction here.  As explained above, the purpose of the PPP is to protect the employment and livelihood of employees who, through no fault of their own, have found their places of employment closed due to the COVID-19 pandemic. That purpose would be frustrated if the Court did not grant the requested preliminary injunction.  "Guaranteeing the plaintiffs' loans now, rather than months from now when this case is over, furthers the public interest in helping all small businesses and their employees get through the pandemic." *Camelot Banquet Rooms*, 2020 WL 2088637, at *12.  The Defendants counter that a preliminary injunction is not in the public interest because "Congress did not deem it in the public interest to compel the SBA to make PPP loans available to businesses of a prurient sexual nature." (Resp. Br., ECF No. 24, PageID.701.)  But for all of the reasons explained in detail above, the Court disagrees and concludes that Congress did intend to include Plaintiffs in the PPP.  Thus, granting preliminary relief is fully consistent with Congress's intent and is in the public interest.  Finally, Defendants argue that others may be harmed by the issuance of an injunction because "PPP financing allocated to Plaintiffs necessarily would come at the cost of denying it to others seeking the same assistance." (*Id.*, PageID.733.)  The Defendants made the same argument in the

*Camelot Banquet Rooms* litigation, and the court there rejected it.  It concluded that "the plaintiffs' high likelihood of success on the merits makes up for this potential harm. That is, because the plaintiffs have shown that they likely should have received PPP loans when they applied, any harm to the third parties who applied after them and who would have received loans if the plaintiffs' applications were denied" is too speculative. *Camelot Banquet Rooms*, 2020 WL 2088637, at *12.  This Court agrees.

Because each of the injunction factors favors issuing a preliminary injunction in this action, the Court will issue such an injunction as set forth below.

## VII

As explained above, Plaintiffs have advanced several constitutional arguments in support of their request for injunctive relief.  The Court does not reach those constitutional claims because "[i]t is well settled that if a case may be decided on either statutory or constitutional grounds, [courts], for sound jurisprudential reasons, [should] inquire first into the statutory question. This practice reflects the deeply rooted doctrine that [courts] ought not to pass on questions of constitutionality . . . unless such adjudication is unavoidable." *Harris v. McRae*, 448 U.S. 297, 306-07 (1980) (internal quotation marks omitted); *see also Camreta v. Greene*, 563 U.S. 692, 706 (2011) (noting that "a longstanding principle of judicial restraint requires that courts avoid reaching constitutional questions in advance of the necessity of deciding them").  Here, because the Court has concluded that the

SBA exceeded its statutory authority when it adopted the PPP Ineligibility Rule, the

Court need not address Plaintiffs' constitutional challenges.

## VIII

Finally, the Court must consider whether to require Plaintiffs to post a bond.

Under Federal Rule of Civil Procedure 65(c), a court may issue a preliminary

injunction "only if the movant gives security in an amount that the court considers

proper to pay the costs and damages sustained by any party found to have been

wrongfully enjoined."  However, notwithstanding that provision, "the rule in [the

Sixth] [C]ircuit has long been that the district court possesses discretion over

whether to require the posting of security." *Motan Co. v. Eagle-Picher Indus., Inc.*,

55 F.3d 1171, 1176 (6th Cir. 1995); *see also Concerned Pastors for Social Action v.

Khouri*, 220 F. Supp. 3d 823, 829 (E.D. Mich. 2016) (same).  And courts have

"significant discretion to waive the bond requirement in light of the public interest."

*Khouri*, 220 F. Supp. 3d at 829.

Here, the Court declines to require a bond.  Forcing Plaintiffs to post a bond

would frustrate the purpose of the PPP and the purpose of the injunction – to get

essential PPP loans to struggling small businesses as soon as possible so that the

businesses may use the funds to pay displaced employees.  If the Court forced the

Plaintiffs to expend funds by posting a bond, that would divert money that could be

used to pay employees and that are needed to help secure Plaintiffs' financial

survival.  Moreover, with the PPP loans, Plaintiffs stand an increased chance of surviving and being able to repay the loans in full in the event that Defendants ultimately prevail on the merits.  That further weighs against requiring a bond here.

## IX

For all of the reasons explained above, **IT IS HEREBY ORDERED** that Plaintiffs' Motion for Preliminary Injunction is **GRANTED AS FOLLOWS**:

1. By 5:00 p.m. Eastern Time on Monday, May 11, 2020, Plaintiffs and Intervenors shall transmit to counsel for Defendants the name and full contact information (including email addresses) for the employee of their lenders who has responsibility for their applications for PPP loans.

2. By 12:00 p.m. Eastern time on Thursday, May 14, 2020, the SBA shall notify the identified lender representatives in writing that (a) the applications by Plaintiffs and Intervenors for PPP loans shall not be denied based on the "prurient sexual nature" provisions of the Original SBA Ineligibility Rule, the 2019 SOP, and/or the PPP Ineligibility Rule, and (b) in the event that Plaintiffs and Intervenors otherwise meet the eligibility requirements for PPP loans, the SBA will guarantee the loans for which Plaintiffs and Intervenors have applied or attempted to apply.

3.  In the event that Plaintiffs and Intervenors otherwise meet the eligibility requirements for PPP loans, the SBA shall guarantee the loans for which Plaintiffs and Intervenors have applied or attempted to apply.

4.  This is not a "nationwide injunction" and does not affect in any way actions that Defendants may take in connection with applications for PPP loans by any entity other than the Plaintiffs and Intervenors in this action.

**IT IS SO ORDERED**.

s/Matthew F. Leitman
MATTHEW F. LEITMAN
UNITED STATES DISTRICT JUDGE

Dated:  May 11, 2020


I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on May 11, 2020, by electronic means and/or ordinary mail.

s/ Holly A. Monda
Case Manager
(810) 341-9764

45